UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

LOUIS WILLIAM PARREANT,

Plaintiff,

v.

JOHN SCHOTZKO,

Defendant.

Civil File No. 00-2014 (JRT/JGL)

**REPORT AND RECOMMENDATION AND ORDER**

Louis William Parreant, Prairie Correctional Facility, 445 South Munsterman, Appleton, Minnesota, 56208, Plaintiff, pro se.

Gregory W. Deckert, Bassford, Lockhart, Truesdell & Briggs, P.A., 3550 Multifoods Tower, 33 South Sixth Street, Minneapolis, Minnesota, 55402, for Defendant.

JONATHAN LEBEDOFF, United States Magistrate Judge

Plaintiff Louis William Parreant, a prisoner at the Prairie Correctional Facility, ("PCF"), in Appleton, Minnesota, is seeking relief under 42 U.S.C. § 1983, for alleged violations of his federal constitutional rights. Defendant John Schotzko, a medical doctor who treated Plaintiff at PCF, has filed a "Motion To Dismiss And For Summary Judgment," (Docket No. 27), contending that this action should be dismissed pursuant to Fed. R. Civ. P. 12(b) and/or 56. Also pending at this time are Plaintiff's motions seeking a temporary restraining order and preliminary injunction, (Docket Nos. 7 and 9), Plaintiff's motion for summary judgment, (Docket No. 32), and Plaintiff's discovery motions, (Docket Nos. 45 and 51).

AUG 0 6 2001
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

This matter has been referred to the undersigned for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons discussed below, it will be recommended that Defendant's motion to dismiss or for summary judgment be DENIED, and that all of Plaintiff's pending motions also be DENIED.

**I. BACKGROUND**

Plaintiff is a prisoner of the State of Wisconsin who is serving a prison term for some undisclosed crime. Near the end of 1999, he was transferred from a state prison in Wisconsin to PCF, which is a privately operated prison facility. All of Plaintiff's claims are based on events that occurred at PCF.

Sometime during the early 1990s, (before Plaintiff entered prison), he had two surgeries performed on his back. Following those surgeries, Plaintiff continued to suffer from chronic back pain. While he was incarcerated in Wisconsin, his health care providers furnished him with pain medications that were reasonably effective at controlling his back pain. For the first several months after his transfer to PCF, Plaintiff continued to receive essentially the same pain medications that he had been receiving in Wisconsin. In the spring of 2000, however, Defendant became primarily responsible for Plaintiff's medical care, and things began to change.

Defendant has been licensed to practice medicine in Minnesota since 1967. (Affidavit of John Schotzko, M.D., [Docket No. 29], ¶ 1.) His specialty is "family practice," and he worked for at least twenty years in that field. (Id., ¶ 2.) Defendant is currently an independent contractor with Whitesell Medical Locums, Ltd., an enterprise that has entered into a contract with PCF to provide medical care for its inmates. (Id., ¶ 2.)

Shortly after Defendant started working at PCF, Plaintiff became one of his patients. Defendant recognized that Plaintiff had "a history of chronic pain resulting from various back surgeries." (Id., ¶ 3.) At the time, Plaintiff was taking Tylenol 3, (which contains codeine), four times per day, plus 5 milligrams of Valium three times per day for muscle spasms. In Defendant's opinion, "plaintiff presented symptoms of serious narcotics addiction," and was, in fact, "addicted to Valium and codeine." (Id., ¶s 3 and 4.) In an effort to cure Plaintiff's addictions, Defendant decided to change Plaintiff's medication regimen. Defendant's "plan was to taper down the dosages in order to wean plaintiff from his addictions." (Id., ¶ 4.) Plaintiff claims that Defendant's weaning plan was a fiasco.

According to Plaintiff, Defendant first started changing his medication regimen in late June of 2000. Instead of allowing Plaintiff to take Tylenol 3 up to four times per day, Defendant allowed Plaintiff to have it only every six hours. Because medications are dispensed to PCF inmates on a fixed schedule, the six-hour minimum interval made it impossible for Plaintiff to get his Tylenol 3 more than three times per day. (Complaint, [Docket No. 1], ¶s 25-26.) Plaintiff submitted written grievances protesting the change in his medication schedule, and the problem apparently was resolved to Plaintiff's satisfaction within a day or two. (Id., ¶s 27-30.)

On July 26, 2000, however, Plaintiff was informed once again that Defendant was changing his medication regimen, this time cutting him down to one Tylenol 3 and one 5 milligram dose of Valium per day. (Id., ¶ 31-32.) During the next two weeks, Plaintiff allegedly suffered a very painful ordeal -- untreated back pain, compounded by withdrawal from narcotics. Between July 26, 2000 and August 9, 2000, Plaintiff's access to Tylenol

3 was significantly curtailed. At one point during that two-week period, he allegedly was deprived of Tylenol 3 for six consecutive days. (Id., ¶s 76-77.) Plaintiff also alleges that he was denied his normal dose of Valium during some of that two-week period. (Id., ¶s 75.)

Although Plaintiff's complaint does a very poor job of explaining how his medication regimen was changed during the two weeks after July 26, 2000, Plaintiff has clearly alleged that he was in substantial pain during that time. On August 2, 2000, for example, Petitioner submitted a prison grievance form in which he said:

> "Hello Dr. Schotzko, please sir, this is my last med request to you. I'm in pain! My back, legs and feet hurt real bad! It's severe. This is and has for the past 7 days ripped a hole in my world! I can't tolerate the pain to [sic] much longer! My head hurts! Please just reinstate my meds as [they] were and I'll back off!"

(Attachment to Complaint.)

The next day, Petitioner sent a grievance to the Warden at PCF, in which he wrote:

> "THIS IS A <u>DECLARATION OF EMERGENCY PLEA FOR HELP!</u> <u>I'M IN PAIN</u>, lower back, hips, legs and feet, headaches. Dr. Schotzko will not correct my meds and feels I don't need Tyl # 3 or Val 5 mg as was ordered by Dr. Glover [Defendant's predecessor at PCF].... I can't function with the pain in back. It's chronic[;] two back surgeries. Is there anything you can do?"

(Attachment to Complaint; emphasis in original.)

Defendant obviously was aware of Plaintiff's suffering, because he did respond to some of Plaintiff's written grievances. Furthermore, Defendant's affidavit does not contradict any of Plaintiff's allegations about the suspension of his pain medications. Nor does Defendant deny in his affidavit (or elsewhere) that he was aware of Plaintiff's alleged pain and suffering during the end of July and beginning of August of last year.

Indeed, Defendant has offered no explanation of his own about what actually happened to Plaintiff during the two-week withdrawal crisis described in the complaint, or what (if anything) he did in response to Plaintiff's health problems. Although Plaintiff's submissions show that Defendant at least considered (and perhaps authorized) some alternative medications during the withdrawal period, Defendant himself has not explained what he knew about Plaintiff's circumstances, how he responded to those circumstances, or why he acted as he did. Instead, Defendant has simply declared that:

> "My decision to taper down the dosages for the plaintiff was based upon my concern for the medical health and well-being of the plaintiff. [ ¶ ] In my opinion, all of the medical care and treatment I have provided to the plaintiff has been in accord with accepted medical practice and the standard of care applicable in this community. My treatment of the plaintiff has been rendered in good faith and based upon the exercise of my informed medical judgment."

(Schotzko Aff., ¶s 5-6.)

Plaintiff completed and signed his complaint in this matter on August 21, 2000, and it was filed by the Clerk's Office the very next day. By that time, Plaintiff was receiving at least some pain medications, and the pain-management crisis that prompted him to file this lawsuit had subsided, at least somewhat.

The Court is unable to determine from the present record just exactly when or how Plaintiff's pain medications were more fully reinstated. Documentation submitted with Plaintiff's "Motion For Preliminary Injunction," (Docket No. 9), suggests that on August 10, 2000, Defendant allowed Plaintiff to begin receiving one Tylenol 3 per day, and that on August 15, 2000, Defendant allowed Plaintiff to begin receiving "Xanax 0.5 mg" twice a day. Plaintiff alleges that as of August 21, 2000, he still was receiving only one Tylenol

3, and one "Zanax 0.5," per day, which was not enough to stop his "pain, muscle spasms, bodyshakes, [and] diarrhea." (Complaint, ¶ 91.) The following month, Plaintiff asked Defendant to allow him to have Tylenol 3 twice a day, but Defendant denied that request.

At some point after August 21, 2000, Defendant recommended that Plaintiff should be examined by a neurosurgeon. Pursuant to that recommendation, Plaintiff was examined on October 24, 2000, by Dr. Bergman, a neurologist at the Hennepin County Medical Center. According to Plaintiff, Dr. Bergman prescribed "Soma 350 mg" for muscle spasms, as well as one or two Tylenol 3s to be given three times per day. ("Plaintiff's Reply To Defendant Answering Civil Complaint," [Docket No. 15], § VI.) Evidently, Plaintiff did begin receiving more Tylenol 3 (as well as Soma), based on Dr. Bergman's prescription, although Plaintiff alleges that as of early November 2000, Defendant was still barring him from receiving more than a single Tylenol 3, three times per day. (Id., § VIII.) Several months later, in a letter to the Court dated February 22, 2001, (Docket No. 37), Plaintiff acknowledged that his "medication at the present is adequate to lesson [sic] pain that persists."

Defendant's affidavit indicates that as of January 12, 2001, he was "no longer seeing plaintiff as a patient." (Schotzko Aff., ¶ 7.) However, in a letter to the Court dated March 26, 2001, (Docket No. 39), Plaintiff indicates that Defendant resumed responsibility for his pain medication regimen, notwithstanding Defendant's earlier termination of their doctor-patient relationship. An "Inmate Medical Request Form" attached to the letter appears to corroborate his assertion. That form says: "Med refills have been referred to Dr. Schotzko. In the future he will renew all of your meds." Plaintiff further represents in

his letter of March 26, 2001:

> "[T]hey are reducing zanax 0.5 mg and then on 4-5-01 no more. Also the tylenol # 3 has been reduced from two tablets 3 x a day to only one tablet 3 x a day. [S]oma is still as neroligist [sic] ordered."

On May 1, 2001, Plaintiff wrote another letter to the Court, (Docket No. 48), complaining that the prison had temporarily run out of Soma. Evidently, the prison health care staff made a bona fide effort to get Plaintiff a generic substitute for Soma as quickly as possible, and Plaintiff was deprived of his medication for only about 36 hours. Nothing in Plaintiff's May 1st letter suggests that Defendant played any role in the brief interruption of his Soma medication.

## II. STANDARD OF REVIEW

A motion to dismiss may be made for "failure to state a claim upon which relief can be granted" and requires a court to review only the pleadings to determine whether the plaintiff has a viable claim. See Fed. R. Civ. P. 12(b)(6). However, where on a Rule 12(b)(6) motion to dismiss, "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Id.; see also Buck v. F.D.I.C., 75 F.3d 1285, 1288 & n.3 (8th Cir. 1996). In this case, the parties have offered, and the Court has considered, information outside the pleadings, namely affidavits, various medical records and grievance forms, and other miscellaneous evidentiary submissions. Consequently, the motion to dismiss will be disposed of as provided in Rule 56.

Under Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A disputed fact is "material" if it must ultimately be resolved and if its resolution will determine the outcome of the case. See id. Materiality is determined by examining the substantive law of the claims. See id.

The non-moving party may not rest upon the pleadings alone as a response but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Although the evidence is examined in the light most favorable to the non-moving party, (see Anderson, 477 U.S. at 255), the non-moving party may not rely on only mere allegations or denials. See Lambert v. City of Dumas, 187 F.3d 931, 934 (8th Cir. 1999) (citations omitted). Additionally, the movant is entitled to summary judgment when the non-movant fails to establish the existence of an essential element of a claim on which that party has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). No genuine issue of material fact exists absent such foundation because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

## III. DISCUSSION

Plaintiff is suing Defendant under 42 U.S.C. § 1983, for alleged violations of his federal constitutional rights. Plaintiff specifically alleges that Defendant violated his Eighth Amendment rights, by being deliberately indifferent to his serious medical needs. Plaintiff

is seeking a judgment that would (a) fully reinstate the pain medications he was receiving before he arrived at PCF, (b) cause him to be transferred back to a Wisconsin prison, and (c) award him money damages in the sum of $500,000.

Defendant's motion to dismiss or for summary judgment presents three specific defenses: (1) that Plaintiff's complaint must be dismissed, because he has not met the requirements for medical malpractice lawsuits prescribed by Minn.Stat. § 145.682; (2) that Plaintiff's complaint does not allege sufficient facts to state an actionable Eighth Amendment claim; and (3) that Plaintiff's claims against Defendant are barred under the doctrine of qualified immunity. (See Defendant's "Memorandum In Support Of Motion For Dismissal And Summary Judgment," [Docket No. 28].) For the reasons discussed below, the Court finds that all three of these defenses are unavailing.

A. Minn.Stat. § 145.682

Defendant initially contends that this action must be dismissed because Plaintiff has not met the requirements of Minn.Stat. § 145.682. That statute requires every plaintiff in a Minnesota medical malpractice case to furnish two affidavits in support of his her or her claims.

> "The first affidavit ('expert review affidavit') must be submitted with the complaint and state that before commencing the lawsuit, plaintiff's attorney [or plaintiff himself in a pro se case] reviewed the facts of the case with a medical expert who believed that at least one defendant named in the suit deviated from the applicable standard of care and thereby injured the plaintiff....
>
> The second affidavit ('expert disclosure affidavit') must be served upon the defendant within 180 days after commencement of the suit and identify each expert plaintiff intends to call at trial, disclose the substance of the facts and opinions to which the expert will testify, and provide a summary of the grounds for each opinion."

Bellecourt v. United States, 784 F.Supp. 623, 636 (D.Minn. 1992), aff'd 994 F.2d 427 (8th Cir. 1993), cert. denied, 510 U.S. 1109 (1994), citing Minn.Stat. § 145.682, subd. 2, subd. 3, and subd. 4. If a medical malpractice complainant fails to meet either one of the two affidavit requirements set forth in § 145.682, the statute provides for "mandatory dismissal." Minn.Stat. § 145.682, subd. 6; see also Stroud v. Hennepin County Medical Center, 556 N.W.2d 552 (Minn. 1996); Lindberg v. Health Partners, Inc., 599 N.W.2d 572 (Minn. 1999).

Defendant contends that Plaintiff's claims against him should be dismissed because Plaintiff has not submitted the first of the two affidavits required by § 145.682, subd. 2. Plaintiff does not deny that he failed to meet the affidavit requirements of § 145.682. He argues, however, that his claims should not be dismissed, because § 145.682 does not apply to this case. The Court agrees with Plaintiff.

Plaintiff has made it quite clear in his original complaint, and in all of his subsequent submissions, that he is seeking relief under 42 U.S.C. § 1983 for alleged violations of his federal constitutional rights. He is not alleging that Defendant was merely negligent, or that he merely committed medical malpractice. Taken as a whole, Plaintiff's submissions clearly indicate that he is suing Defendant for violating his Eighth Amendment rights; i.e., for inflicting "cruel and unusual punishment" by deliberately disregarding Plaintiff's serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 102-03 (1976).

Defendant has cited no legal authority suggesting that Minn. Stat. § 145.682 is applicable to a civil rights claim brought under 42 U.S.C. § 1983, and the Court finds no reason to believe that § 145.682 should be applied to prisoner Eighth Amendment claims.

While there does not appear to be any Minnesota case law directly on point, the Court notes that the Northern District of Illinois has twice rejected an argument similar to the one advanced by Defendant here. Senisais v. Fitzgerald, 940 F.Supp. 196, 199-200 (N.D.Ill. 1996); Doe v. City of Chicago, 883 F.Supp. 1126, 1134 (N.D.Ill. 1994). See also Thomas v. James, 809 F.Supp. 448, 449 (W.D.La. 1993) (prisoner not required to submit claim to state's "medical review panel" before filing § 1983 action in federal court, because prisoner was not alleging malpractice, but intentional failure to treat his serious medical needs).

Section 145.682, on its face, is aimed at claims of "malpractice, error, mistake or failure to cure," (§ 145.682, subd. 2) – i.e., negligence, not "cruel and unusual punishment" or deliberate disregard of serious medical needs. Indeed, Defendant himself acknowledges that "[t]he Minnesota legislature passed this statute [§ 145.682] in 1986 as part of a reform package to eliminate nuisance malpractice suits." (Defendant's "Memorandum In Support Of Motion For Dismissal And Summary Judgment," [Docket No. 28], p. 3, [emphasis added].)

More importantly, this case involves a federal question, (i.e., whether Defendant violated Plaintiff's Eighth Amendment rights), which has been brought to federal court pursuant to a federal statute, (42 U.S.C. § 1983). Therefore, Plaintiff's substantive legal rights must be determined on the basis of federal law – not state law. Defendant has failed to explain how Plaintiff's federal rights and remedies can be diminished by a state statute affecting the rights and remedies available under state common law.

It is true that, under certain very limited circumstances, federal courts will look to relevant state law to resolve legal issues arising in federal civil rights actions. This

practice is authorized by 42 U.S.C. § 1988(a), which provides that:

> "The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty."

However, § 1988(a) authorizes federal courts to "borrow" from state law in civil rights actions only "where federal law is unsuited or insufficient 'to furnish suitable remedies.'" Moor v. Alameda County, 411 U.S. 693, 703 (1973) (quoting § 1988(a)). Moreover, § 1988(a) clearly indicates that "state law shall only apply 'so far as the same is not inconsistent with' federal law." Wilson v. Garcia, 471 U.S. 261, 269 (1985). As the Supreme Court pointed out in Wilson, when Congress enacted § 1988(a), it "surely did not intend to assign to state courts and legislatures a conclusive role in the formative function of defining and characterizing the essential elements of a federal cause of action." Id.[1]

---

[1] The borrowing procedure authorized by § 1988(a) is substantially different from the one set forth in the Federal Tort Claims Act, ("FTCA"). The FTCA expressly provides, (at 28 U.S.C. § 1346(b)), that a plaintiff's claims are subject to, and governed by, the substantive law of the state in which the claims arose. Therefore, Minn.Stat. § 145.682 does apply to medical malpractice cases arising in Minnesota and brought in federal court under the FTCA. Oslund v. United States of America, 701 F.Supp. 710 (D.Minn. 1988); Bellecourt v. United States, supra; Anderson v. United States of America, No. Civ. 5-96-235 JRT/RLE, 1998 WL 92460 (D. Minn. 1998). The federal civil rights statutes do not include any borrowing language comparable to the FTCA's.

Here, there is no need to "borrow" § 145.682. Defendant has not identified any gap, omission or insufficiency in § 1983 that should be resolved by incorporating Minnesota state law pursuant to § 1988(a). Instead, Defendant is seeking to add an entirely new element to prisoner Eighth Amendment claims brought under § 1983 -- namely that prisoner-plaintiffs must comply with Minn.Stat. § 145.682 in order to obtain relief for violations of their federally protected civil rights. Adding such a requirement is not authorized by § 1988(a), however, because it is not needed to cure any deficiency in the federal cause of action provided by § 1983. If anything, adding such a requirement would seem to be inconsistent with the remedy provided by the federal civil rights statutes, because it would tend to diminish the availability of that remedy.

In sum, the Court can find no legal rationale, under § 1988(a) or otherwise, for engrafting the requirements of § 145.682 onto 42 U.S.C. § 1983. Therefore, Plaintiff's Eighth Amendment claim should not be dismissed based on his failure to meet the affidavit requirements prescribed by § 145.682.

B. Sufficiency Of Plaintiff's Factual Allegations

Defendant next argues that this action should be dismissed because Plaintiff's complaint fails to state an actionable Eighth Amendment claim. Again, the Court disagrees.

"It has long been established that prison officials violate a prisoner's Eighth Amendment right to be free from cruel and unusual punishment when the officials are deliberately indifferent to the prisoner's serious medical needs." Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995), citing Estelle v. Gamble, 429 U.S. at 104. "A prison official

exhibits deliberate indifference when the official actually 'knows of and disregards' a prisoner's serious medical needs." Boyd, supra, quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994).

> "An Eighth Amendment claim that prison officials were deliberately indifferent to the medical needs of inmates involves both an objective and a subjective component. [Citation omitted.] The plaintiffs must demonstrate (1) that they suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs. [Citation omitted.] 'Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.' ' Hudson v. McMillian, 503 U.S. 1, 9,... (1992). '[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge.' Long v. Nix, 86 F.3d 761, 765 (8th Cir.1996). As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Id."

Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997). See also Mays v. Rhodes, No. 00-1822 (8th Cir. June 29, 2001), 2001 WL 726802 at *4 ("[d]eliberate indifference requires proof that [the prisoner-plaintiff] suffered objectively serious medical needs and that the [prison official defendants] actually knew of those needs but deliberately disregarded them").

Thus, a prisoner's complaint must include three essential elements to state an Eighth Amendment claim against a prison official based on an alleged denial of medical care. First, the prisoner must allege facts showing some specific objectively serious medical need, i.e., one that is both readily discernible and involves an excessive risk to the inmate's health. Second, it must be alleged that the defendant was personally aware of the inmate's particular medical need and its seriousness. Third, the complaint must

allege that the defendant, while aware of the prisoner's serious medical needs, was deliberately indifferent to those needs.

In this case, Plaintiff alleges that Defendant deliberately cut off his access to Tylenol 3 and Valium, with full knowledge that Plaintiff was addicted to those drugs. Plaintiff further alleges that as a result of Defendant's actions, he suffered increased pain in his lower back, legs, feet and head, as well as withdrawal symptoms, including "daily constant diarrhea and stomach cramps." (Complaint, ¶s 41 and 44.) The grievance forms attached to the complaint also indicate that Plaintiff was in serious discomfort during the two-week period when his normal drug regimen was interrupted. As previously noted, he identified one of his grievances as a "DECLARATION OF EMERGENCY PLEA FOR HELP!," and emphasized "I'M IN PAIN, lower back, hips, legs and feet, headaches." He also wrote to Defendant, informing him that "My back, legs and feet hurt real bad! It's severe. This is and has for the past 7 days ripped a hole in my world! I can't tolerate the pain to [sic] much longer! My head hurts! Please just reinstate my meds as [they] were and I'll back off!" (See p. 4, supra.) Looking at the complaint and its attachments as a whole, the Court finds that Plaintiff has adequately alleged that he had a serious need for medical attention during the end of July and the first part of August 2000.

The Court also finds that Plaintiff has adequately alleged that Defendant was personally aware of his serious medical needs. Although the chronology of events described in the complaint is somewhat confusing, Plaintiff's pleading clearly indicates that Defendant knew Plaintiff was addicted to narcotic strength medications that were being used to treat his back pain. It also clearly appears that Defendant was responsible for the

alleged interruption of Plaintiff's longstanding pain medication regimen. And it can easily be inferred from Plaintiff's pleading that Defendant knew Plaintiff would suffer withdrawal symptoms, as well as more severe pain in his back (and other parts of his body), upon suspension of his accustomed medication regimen.

More importantly, even if Defendant had not accurately foreseen how Plaintiff might react to a change in his medications, it appears, (at least from Plaintiff's uncontradicted submissions), that Defendant must have been aware of Plaintiff's health problems during the end of July and beginning of August of 2000. During that period, Plaintiff sent at least one written grievance directly to Defendant, and Plaintiff also asked other prison staff members to solicit Defendant's help. Moreover, Defendant wrote back to Plaintiff in response to his grievances, which confirms that Defendant must have been aware of Plaintiff's pain.

Plaintiff has also adequately alleged that Defendant did not provide any meaningful medical assistance to him during the last part of July and the early part of August. At some point around the 10th of August, 2000, Defendant restored some of Plaintiff's medications. For nearly two weeks before that date, however, it appears from the complaint that Defendant turned a deaf ear to Plaintiff's pleas for medical help.

In sum, the Court finds that Plaintiff has alleged facts showing that (1) he had serious medical needs during the period of approximately July 26, 2000, to August 10, 2000 – namely untreated pain from a pre-existing back condition, together with withdrawal symptoms; (2) Defendant was aware of Plaintiff's serious medical needs; and (3) Defendant deliberately disregarded Plaintiff's need for medical attention. Whether Plaintiff

can ultimately sustain those three allegations remains to be seen. At this point, however, the Court cannot conclude that Plaintiff's pleading fails to state an actionable Eighth Amendment claim.

Although Defendant's motion appears to be aimed only at the sufficiency of Plaintiff's pleading, the Court has also considered whether Defendant has presented enough evidence to warrant dismissal of Plaintiff's complaint on summary judgment. He has not. Indeed, Defendant's affidavit in support of his motion for summary judgment is plainly deficient.

Defendant's affidavit is less than two full pages, and it provides no meaningful information about what happened to Plaintiff during the end of July and beginning of August of 2000. No medical records or other documents were provided with the affidavit, (or otherwise), no other affidavits were filed, and no other evidence of any kind was offered in support of the summary judgment motion. See Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990) (noting the significance of the prisoner's medical records in an Eighth Amendment case involving allegations of inadequate medical treatment).[2] Defendant's affidavit does not contradict (or even mention) Plaintiff's description of his suffering, nor does it provide any reason to believe that Defendant was unaware of Plaintiff's alleged ordeal. Finally, the affidavit does not suggest that Defendant took any action to relieve

[2] In the instant case, the only medical records in the court file are those that have been submitted by Plaintiff. Without some explanation from Defendant, those records are of limited value to the Court.

Plaintiff's alleged distress.[3]

Given the paucity of Defendant's evidentiary submissions, the Court cannot recommend that his motion for summary judgment be granted. The present record leaves too many unanswered questions about what happened during the critical two or three week period in late July and early August of 2000. Those unresolved issues of fact preclude summary judgment at this time.

C. Qualified Immunity

In his final argument, Defendant claims that this action should be dismissed on the grounds of qualified immunity. The Court rejects this argument too.

"Qualified immunity shields government officials from suit unless their conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." Yowell v. Combs, 89 F.3d 542, 544 (8th Cir. 1996), citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity protects 'all but the plainly

---

[3] Defendant asserts in his affidavit that he had a "plan to taper down the dosages [of Plaintiff's addictive medications] to wean plaintiff from his addictions." (Schotzko aff., at ¶ 4.) That is certainly a good and proper objective. A well-conceived and well-executed plan to overcome a prisoner's drug addictions, (i.e., a plan that would minimize the prisoner's withdrawal symptoms and other types of pain), would undoubtedly be constitutionally permissible. See e.g., Freed v. Horn, No. 95-CV-2824 (E.D.Pa. 1995), 1995 WL 710529 (granting summary judgment to doctors who attempted to overcome a prisoner-plaintiff's addiction to Percocet by gradually reducing his daily dosage over a three-week period "in order to insure that he would not experience symptoms of withdrawal") (emphasis added). However, Defendant has not shown -- or even attempted to show -- that he actually implemented a careful "weaning" program, designed to cure Plaintiff's addiction as painlessly as possible. Based on Plaintiff's allegations, and Defendant's brief conclusory affidavit, the Court is left with the impression that Defendant callously attempted to "cure" Plaintiff's addiction with a torturous "cold turkey" approach. Hopefully, that is not what actually happened. But that is the picture that Plaintiff has painted, and Defendant has made no effort to refute it.

incompetent or those who willingly violate the law.'" Jackson v. Everett, 140 F.3d 1149, 1151 (8th Cir. 1998), quoting Malley v. Briggs, 475 U.S. 335, 341 (1986).

To determine whether a defendant is entitled to qualified immunity, a court must perform a two-prong analysis. First, the court must "determine whether the plaintiff has alleged the violation of a constitutional right." Manzano v. South Dakota Dept. of Social Services, 60 F.3d 505, 509 (8th Cir. 1995). Second, the court must determine whether the constitutional principle at issue was so clearly established that a reasonable person in the defendant's position would have known that he or she was violating that right by doing (or failing to do) what the plaintiff has alleged. Id. As explained by our Court of Appeals:

> "First, the court must see if a deprivation of constitutional magnitude has been alleged. If so, the court must determine if that right was so clearly established that a reasonable public official would have known his or her conduct violated the Constitution at the time of the act."

Weiler v. Purkett, 137 F.3d 1047, 1050 (8th Cir. 1998) (en banc).

Here, the Court has already determined that Plaintiff has adequately alleged that Defendant deprived him of his constitutional rights under the Eighth Amendment. Therefore, Plaintiff has survived the first half of the qualified immunity test. The Court also finds that Plaintiff survives the second half of the qualified immunity test, because the principle under which he is suing -- that prison officials cannot be deliberately indifferent to a prisoner's serious medical needs -- has been well-established for a long time. See Estelle v. Gamble, supra. A reasonable prison doctor would recognize that an Eighth Amendment violation could occur if he abruptly terminated a prisoner's access to medications to which the prisoner had been physically addicted for several years, and then turned his back when the prisoner pleaded for medical help in dealing with significant pain

and withdrawal symptoms.[4] Thus, the Court concludes that Defendant is not eligible for qualified immunity.

Furthermore, Defendant has made no effort to distinguish this case from Richardson v. McKnight, 521 U.S. 399 (1997), where the Supreme Court held that prison officials at privately operated prisons cannot be granted qualified immunity. In the words of the Supreme Court, "private prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case." Id. at 412. Because Plaintiff's § 1983 claims against Defendant are based on acts and omissions that occurred while Defendant was working for a private prison, Richardson appears to be fully applicable here.

Defendant supports his qualified immunity defense by citing two § 1983 cases in which prisoner Eighth Amendment claims against doctor-defendants were dismissed based on qualified immunity. Those two cases are Smith v. Marcantonio, 910 F.2d 500, 501 (8th Cir. 1990) and Lee v. McManus, 589 F.Supp. 633 (D.Kan. 1984). However, Smith and Lee are readily distinguishable from the present case, because the doctor-defendants in both of those earlier cases were employed by, or hired by, a state – not a private prison company. In this case, the record shows that Defendant has no connection to any state. Defendant works for a private enterprise known as "Whitesell Medical Locums, Ltd.," which apparently contracted with the private corporation that operates PCF, for the purpose of

---

[4] Again, the Court has made no findings of fact about what actually did happen to Plaintiff during the end of July and beginning of August of 2000; but if Defendant suddenly suspended Plaintiff's access to drugs to which he was physically addicted, and if Defendant ignored Plaintiff's pleas for medical assistance to cope with significant suffering, then Defendant should have known that he could be violating Plaintiff's Eighth Amendment rights.

having Defendant provide medical services to inmates at PCF. (See Schotzko Aff., at ¶ 29.) Defendant, like the prison guards in Richardson, has no direct connection with any state agency. Thus, the Court finds that Defendant is no more entitled to qualified immunity than were the private prison guards who were sued in Richardson.

For the reasons discussed above, the Court concludes that Defendant is not entitled to summary judgment based on any of the three arguments he has raised. Plaintiff's complaint adequately alleges that Defendant violated his constitutional rights under the Eighth Amendment, and Defendant has not presented sufficient evidence to refute Plaintiff's allegations. In addition, Defendant's two affirmative defenses – qualified immunity and non-compliance with Minn.Stat. § 145.682 – are both ineffectual. It will therefore be recommended that Defendant's motion to dismiss or for summary judgment be denied.

## IV. OTHER PENDING MOTIONS

There are several other pending motions in this matter, which must also be addressed.

A. Plaintiff's Motions For Temporary Restraining Order And Preliminary Injunction

Plaintiff has filed separate motions requesting a temporary restraining order, and a preliminary injunction. (Docket Nos. 7 and 9.) In both motions, Plaintiff is seeking an order that would require Defendant (and others employed at PCF) to (i) reinstate the full medication regimen that he had been receiving before he arrived at PCF, and (ii) make arrangements for an independent medical examination by a neurology specialist.

When determining whether to grant preliminary injunctive relief, courts must consider four factors: (1) whether the moving party will suffer irreparable harm if an injunction is not granted; (2) whether the potential detriment to the non-moving party from granting the injunction would outweigh any threat of irreparable harm to the movant; (3) whether the moving party will probably succeed on the merits of his claim(s); and (4) how public interests may be effected by granting or denying the injunction. Dataphase Systems, Inc. v. C.L. Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981). The party seeking relief has the burden of establishing that these four factors weigh in favor of granting the requested injunction. Modern Computer Systems, Inc. v. Modern Banking Systems, Inc., 871 F.2d 734, 737 (8th Cir. 1989).

Courts must also bear in mind that prison officials are given broad discretion to perform their difficult assignments as they deem appropriate, and that federal courts should refrain from micro-managing prison facilities. Turner v. Safley, 482 U.S. 78, 84-85, (1987); Sandin v. Conner, 515 U.S. 472, 482 (1995). Therefore, "in the prison context, a request for injunctive relief must always be viewed with great caution because 'judicial restraint is especially called for in dealing with complex and intractable problems of prison administration.'" Goff v. Harper, 60 F.3d 518, 520 (8th Cir. 1995), quoting Rogers v. Scurr, 676 F.2d 1211, 1214 (8th Cir. 1982).

Applying these principles here, the Court finds that Plaintiff has not sustained his requests for preliminary injunctive relief.

To the extent that Plaintiff is seeking an examination by an independent neurology specialist, it appears that his motions are moot. Within a few weeks after his motions were

filed, Plaintiff was examined by Dr. Bergman at the Hennepin County Medical Center. Dr. Bergman apparently provided the examination/consultation that Plaintiff was seeking, and Plaintiff has not renewed his request for injunctive relief since he was seen by Dr. Bergman.

To the extent that Plaintiff is seeking an order that would reinstate his pre-PCF medication regimen, his motions must be denied for lack of evidentiary support. To support his motions for injunctive relief, Plaintiff has offered nothing more than his own self-serving (non-medical) opinion that it is in his best interest to continue the same drug regimen that he had been following before his arrival at PCF. (See Plaintiff's "Affidavit In Support Of Motion For A Temporary Restraining Order – And Preliminary Injunction," [Docket No. 8].) Although Plaintiff's submissions do raise concerns about the adequacy and propriety of his medical care at PCF, Plaintiff has not adequately demonstrated that his medication regimen must not be altered. Whether Plaintiff's medication regimen should be changed obviously is a medical issue that cannot properly be addressed without competent and comprehensive medical evidence. Plaintiff has not shown that his pre-PCF medication regimen is the only medically appropriate one, and that any alteration of that regimen would violate his legal rights.[5]

---

[5] The Court has not overlooked Plaintiff's numerous references to Dr. Bergman's report, which purportedly recommends that Plaintiff's pre-PCF drug regimen should be reinstated. Even if Plaintiff's interpretation of Dr. Bergman's report were accurate, that would not necessarily mean that the pre-PCF medication regimen is the only constitutional one. Plaintiff's resistance to change is understandable, but some change in his medication regimen, to wean him from addictive drugs, may be medically justifiable and constitutionally permissible.

Finally, Plaintiff's own submissions indicate that, in fact, he has been receiving adequate medication for his back condition. He has expressly acknowledged that "medication at the present is adequate to lesson [sic] pain that persists." (Letter to the Court dated February 22, 2001, [Docket No. 37].) Based on this admission, and the other reasons discussed above, it is recommended that Plaintiff's motions for a temporary restraining order and a preliminary injunction be denied.[6]

B. Plaintiff's Motion For Summary Judgment

Plaintiff has filed a motion for summary judgment, (Docket No. 27), which must be denied, because the Court has determined (as discussed above) that there are issues of fact presented in this case, which preclude summary judgment based on the existing record. Plaintiff has adequately alleged that Defendant violated his Eighth Amendment rights, but he has not yet adequately proven his claim.

C. Plaintiff's Discovery Motions

Finally, there are two pending discovery motions in this case that must be addressed – Plaintiff's "Request For Motion To Obtain Affidavit From Nero [sic] Surgeon Dr. Bergman Under Oath," and Plaintiff's "Motion To Disclose Complaints/ In Or Out Of Court Litigation Settled/ And Court Litigation From Prisoners At Prairie Correctional Facility Against Physician Dr. Schotzko." (Docket Nos. 45 and 51.) Both of these motions will be denied.

---

[6] On July 27, 2001, the Court received a letter from Plaintiff, in which he claims that Defendant is once again threatening to terminate his pain medications altogether. By separate order, the Court has construed Plaintiff's recent letter to be another request for a temporary restraining order. Defendant has been given until August14, 2001, to respond to that request.

In his first discovery motion, Plaintiff is seeking an order "to obtain oral affidavit from Dr. Bergman nero [sic] surgeon being witnessed by Court stenographer, and U.S. Marshals." Plaintiff apparently wants to perpetuate certain helpful testimony that he believes Dr. Bergman could provide. However, Plaintiff has failed to identify any legal authority by which the Court could compel Dr. Bergman to provide an "oral affidavit" in this matter. Dr. Bergman is not a party to this action, and it does not appear that he has defied any subpoena directing him to testify in this matter. Because the Plaintiff has not cited any legal authority for compelling Dr. Bergman to give an "oral affidavit" in this matter, his initial discovery motion will be denied.[7]

In his second discovery motion, Plaintiff is seeking an order that would compel Defendant to disclose information about other lawsuits brought against him. Plaintiff asked for such information in a set of interrogatories that he propounded to Defendant, and Defendant responded by stating that there were no other legal actions pending against him.[8] Plaintiff has not shown (or even argued) that Defendant's answer was incomplete or non-responsive. Instead, it appears that Plaintiff simply believes Defendant's answer to the interrogatory is not truthful.

If Plaintiff wishes to challenge the factual accuracy of Defendant's answer to an interrogatory, he will have to do so by means other than a discovery motion. A court can

---

[7] The denial of Plaintiff's present motion obviously does not preclude him from continuing to pursue Dr. Bergman's assistance.

[8] Defendant's "Answers To Interrogatories" are attached to the Affidavit of Gregory W. Deckert. (Docket No. 55.) Interrogatory No. 5, and the corresponding answer, are pertinent here.

compel a party to answer interrogatories, and a court can (under certain circumstances) sanction a party who provides a perjurious answer to an interrogatory. However, a court will not compel a party to change his answer to an interrogatory, simply because the Plaintiff does not believe the answer is accurate. Because Defendant has provided a complete and responsive answer to the interrogatory at issue, and Plaintiff has not shown that Defendant lied, Plaintiff's second discovery motion must also be denied.

## V. ORDER AND RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY ORDERED** that:

1. Plaintiff's "Request For Motion To Obtain Affidavit From Nero [sic] Surgeon Dr. Bergman Under Oath," (Docket No. 45), is **DENIED**; and

2. Plaintiff's "Motion To Disclose Complaints/ In Or Out Of Court Litigation Settled/ And Court Litigation From Prisoners At Prairie Correctional Facility Against Physician Dr. Schotzko," (Docket No. 51), is **DENIED**;

**AND IT IS HEREBY RECOMMENDED** that:

1. Defendant's "Motion To Dismiss And For Summary Judgment," (Docket No. 27), be **DENIED**;

2. Plaintiff's motions for a temporary restraining order and preliminary injunction, (Docket Nos. 7 and 9), be **DENIED**; and

3. Plaintiff's motion for summary judgment, (Docket No. 32), be **DENIED**.

Dated: August 6, 2001

JONATHAN LEBEDOFF
United States Magistrate Judge

Under D.Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by August 23, 2001, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

# Please forward this announcement to the recipient of this fax.

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

## For additional information on either program please visit our website at www.mnd.uscourts.gov.

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500