UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

LOUIS WILLIAM PARREANT,

Plaintiff,

v.

JOHN SCHOTZKO, and CORRECTIONS CORPORATION OF AMERICA, INC.,

Defendants.

Civil File No. 00-2014 (JRT/JGL)

**REPORT AND RECOMMENDATION**

Louis William Parreant, Prairie Correctional Facility, 445 South Munsterman, Appleton, Minnesota, 56208, Plaintiff, pro se.

Gregory W. Deckert, Bassford, Lockhart, et al., 33 South Sixth Street, Minneapolis, Minnesota, 55402, for Defendant John Schotzko.

Robert M. Lewis and Rebecca A. Chaffee, Best & Flanagan, LLP, 225 South Sixth Street, Suite 4000, Minneapolis, Minnesota,55402, for Defendant Corrections Corporation of America, Inc.

JONATHAN LEBEDOFF, Chief Magistrate Judge

This matter has been referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636 and Local Rule 72.1(c), for a Report and Recommendation on motions for summary judgment that have been filed by both of the named Defendants, and by Plaintiff. For the reasons discussed below, the Court will recommend that Defendants motions for summary judgment be granted, that Plaintiff's motion for summary judgment be denied, and that this action be dismissed with prejudice.

## I. PROCEDURAL BACKGROUND

Plaintiff, Louis William Parreant, is a prisoner of the State of Wisconsin who is incarcerated for some undisclosed state criminal conviction. Near the end of 1999, he was

FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

transferred from a state prison in Wisconsin to the Prairie Correctional Facility, ("PCF"), in Appleton, Minnesota. PCF is a private prison owned and operated by Defendant Corrections Corporation of America, Inc., ("CCA"). Defendant Dr. John Schotzko is a physician who worked at PCF from approximately May 2000 until September 19, 2001. Schotzko was not employed directly by CCA; he was actually employed by Whitesell Medical Locums, Ltd., which had entered into a contract to provide medical care to PCF inmates.

Plaintiff commenced this action in August 2000, by filing a complaint seeking relief from Dr. Schotzko under 42 U.S.C. § 1983. The complaint alleged that Dr. Schotzko had violated Plaintiff's Eighth Amendment rights by failing to provide proper medical care for his back pain. Dr. Schotzko filed a motion to dismiss the complaint, but that motion was denied. (See "Report and Recommendation and Order," dated August 6, 2001, [Docket Nos. 61 and 62], [hereafter "R&R-I"], and "Memorandum Opinion and Order" adopting R&R-I, dated September 30, 2001, [Docket No. 76].)

Plaintiff subsequently filed an Amended Complaint, (Docket No. 80), which added a new Defendant, CCA, and new allegations of new Eighth Amendment violations.[1] CCA and Dr. Schotzko answered the Amended Complaint, and later filed the motions for

---

[1] It appears that Plaintiff may have been trying to add PCF itself as a new Defendant in this case. According to CCA, however, PCF is not a suable entity; it is merely the name that is used to identify the particular CCA prison facility where Plaintiff is confined. Plaintiff has offered no meaningful argument to the contrary. It also appears that Plaintiff's Amended Complaint may have been intended to bring in several individual PCF employees as new Defendants. However, the record indicates that service of process has been affected only on Dr. Schotzko and CCA, which means they are the only two parties who are subject to personal jurisdiction in this action. Therefore, Dr. Schotzko and CCA are the only Defendants in this case at this time.

summary judgment that are now before the Court.

## II. FACTS [2]

Before entering prison, Plaintiff had two back surgeries that left him battling chronic back pain. While he was incarcerated in Wisconsin, he was able to cope with his pain by taking narcotic pain killers -- most notably Tylenol-3, (which contains codeine), and Valium.

When Plaintiff first arrived at PCF, he continued to receive the same type of pain medications that he had been receiving in Wisconsin. In the spring of 2000, however, Dr. Schotzko became Plaintiff's physician, and he started to modify Plaintiff's drug regimen. Dr. Schotzko concluded that Plaintiff was addicted to Tylenol-3 and Valium, and he decided that Plaintiff should stop taking those medications. Over Plaintiff's vigorous objections, Dr. Schotzko implemented a plan to "wean" Plaintiff from Tylenol-3 and Valium. That plan -- which apparently has been an ongoing work-in-progress for more than two years now -- is the source of this lawsuit.

Plaintiff alleges that Defendants deliberately deprived him of Tylenol-3 and/or Valium for a week or two at a time, on two separate occasions, even though they knew he would suffer excruciating pain as a result of their actions. Plaintiff claims that Defendants violated his Eighth Amendment rights by their alleged deliberate indifference to his serious medical needs.[3]

---

[2] The factual background provided in R&R-1 will not be fully reiterated here. The present discussion of the facts will focus on new evidence of record.

[3] It appears that Plaintiff may also be trying to advance some of type of "denial of access to the courts" claim, based on allegations that he was not granted sufficient opportunities to use the prison law library at PCF. If Plaintiff is indeed attempting to maintain such a claim, it must be summarily dismissed for two reasons. First, Plaintiff has not alleged any facts suggesting that either of the present Defendants (Dr. Schotzko or

The first time Plaintiff's drug supply was interrupted was in late July and early August of 2000. By then, Dr. Schotzko had been threatening to reduce Plaintiff's use of Tylenol-3 and Valium for two months or more. He actually carried out that threat starting on Thursday, July 27, 2000 – the day before he started his normal three-day weekend. Starting on or about that date, Dr. Schotzko allowed Plaintiff to receive only one Tylenol-3 at bedtime, rather than his usual three per day. Dr. Schotzko did not work at the prison on the following Friday, Saturday and Sunday, (July 28-30), when Plaintiff began to feel the withdrawal effects of his reduced medication.

The single Tylenol-3 at bedtime was not the only pain medication available to Plaintiff during Dr. Schotzko's three-day weekend at the end of July. Dr. Schotzko also prescribed Darvocet – a pain reliever, which he claims "performs the same function as Tylenol-3." (Affidavit of John R. Schotzko, M.D., [Docket No. 121], ¶ 20.) Plaintiff refused to take the Darvocet, however, because he claims he had tried it before and it upset his stomach without alleviating his pain. ("Plaintiff's Affidavit of Record and Reply to the Affidavit of John R. Schotzko, M.D. [etc.]," [Docket No. 126], ¶ 20.)

Plaintiff submitted numerous written grievances during Dr. Schotzko's three-day weekend at the end of July. (Attachments to Plaintiff's original complaint; [Docket No. 1].) Those grievances show that Plaintiff was in severe pain during that three-day period. Dr.

---

CCA) was responsible for, (or even aware of), any restrictions on Plaintiff's access to the law library. Secondly, and perhaps more significantly, Plaintiff has not alleged any facts suggesting that he suffered any "actual injury" due to inadequate access to legal resources. See Klinger v. Department of Corrections, 107 F.3d 609, 617 (8th Cir. 1997) ("[i]n Lewis v. Casey, [518 U.S. 343, 349 (1996)], the Supreme Court held, based upon principles of standing, that actual injury must be proven in order to prevail on an access-to-courts claim").

Schotzko says that he never saw any of those grievances, and that he was unaware of Plaintiff's complaints of pain until he came back to the prison on Monday July 31, 2000. (Schotzko Aff., ¶s 15-19.) On the day he returned to work, Dr. Schotzko met with Plaintiff and talked to him about his plan to wean him from codeine. Plaintiff asked Dr. Schotzko to reinstate his normal drug regimen, including three doses of Tylenol-3 per day, but that request was denied.[4] Dr. Schotzko did offer to prescribe a drug called Baclofen, a muscle relaxant intended to serve as a substitute for Valium, but Plaintiff refused to take it. (Schotzko Aff., ¶ 21.)

On August 2, Plaintiff sent a grievance to Dr. Schotzko in which he pleaded for pain medications, presumably hoping for reinstatement of his customary dosages of Tylenol-3. Plaintiff threatened to file a lawsuit if he did not get the medications he was seeking. ("Inmate Medical Request Form" dated August 2, 2000, attached to Schotzko Aff.) Dr. Schotzko responded to Plaintiff's grievance (on August 3) by cutting off Plaintiff's access to Tylenol-3 and Valium altogether -- i.e., even the bedtime dose was discontinued. Dr. Schotzko explained that he was completely eliminating Plaintiff's longstanding prescription for Tylenol-3, (to which he knew Plaintiff was addicted), because it "obviously [is] not helping you much." (Id.) At the same time, Dr. Schotzko again revised Plaintiff's recommended drug regimen. He prescribed Tylenol-1, (which has no codeine), Darvocet, Imipramine, (an anti-depressant), and Xanax, (a muscle relaxant). Plaintiff took the Xanax and found that it provided some relief. However, he declined to take either Darvocet or

---

[4] According to Dr. Schotzko, Plaintiff "yelled and gestured wildly" during their meeting on July 31. (Schotzko Aff., ¶ 21.) Plaintiff strongly denies that assertion. The Court finds this disagreement over Plaintiff's demeanor to be inconsequential for purposes of resolving the presently pending motions.

Imipramine, because he believed they would not help him, and he was concerned about their possible side-effects.

The present record does not provide a clear explanation of Plaintiff's medical treatment during the next week.[5] On August 10, Dr. Schotzko changed Plaintiff's drug regimen once again. He reinstated Plaintiff's once-a-day prescription for Tylenol-3, reasoning that "this level of medication does not pose much risk of addiction as differentiated from 'habituation.'" ("Inmate Medical Request Form" dated August 9, 2000, attached to Schotzko Aff.) Shortly thereafter, Plaintiff's prescription for Xanax was increased from once per day to twice per day.

During the next two months, (August and September of 2000), Plaintiff frequently asked for more medications (particularly Tylenol-3) to help him cope with his ongoing pain. Dr. Schotzko did allow Plaintiff to receive more Tylenol-3 and Xanax from time to time, and Plaintiff's complaints of pain became less urgent -- although they certainly did not cease altogether.

In October 2000, Plaintiff was examined by Dr. Thomas Bergman, a neurologic surgeon who works outside of the prison. Based on Dr. Bergman's recommendation, Plaintiff started receiving Soma, (used to treat muscle spasms), to supplement his pain medications. In a letter to the Court dated February 22, 2001, (Docket No. 37), Plaintiff acknowledged that his "medication at the present is adequate to lesson [sic] pain that persists."

---

[5] The District Court Judge's order adopting R&R-I pointed out that the evidence submitted by the parties regarding Plaintiff's medical treatment at PCF was conspicuously incomplete. Although the parties have since added some new information, there still are some gaps in the record.

The next significant crisis occurred in September 2001 – after R&R-I was filed, and before Plaintiff amended his complaint. Plaintiff alleges that on September 7, 2001, his prescriptions for Tylenol-3 and Soma were "terminated," and he "went through severe spinal pain and muscle spasms again compounded by pain of withdrawals." (Amended Complaint, [Docket No. 80], p. 6.) During the next few days, Plaintiff made numerous requests for reinstatement of his medications. (Id.) However, it was not until a week later, September 14, that Plaintiff finally received some Soma and Xanax. Plaintiff did not receive any Tylenol-3 until September 15. (Id.; see also "Exhibit C" attached to Amended Complaint.) Plaintiff also alleges that he was not given Soma during another five-day period in late September. (Id., p. 7.)

Defendants have not offered any evidence that contradicts Plaintiff's allegations regarding the events of September 7-15, 2001. At the same time, however, Plaintiff has not attempted to show, nor has even alleged, that either of the two named Defendants was responsible for the termination of his medications in September 2001. Referring to the mid-September medication lapse, Defendant CCA contends that if "a delay occurred, there is no evidence that any delay was caused by anything other than an inadvertent oversight or by the implementation of a legitimate penological interest."[6] (CCA's "Memorandum of Law In Support of It's Motion for Summary Judgment," [Docket No. 107], p. 7.) Plaintiff denies that the medication lapse was caused by any "oversight" or "penological interest," (Plaintiff's "Reply & Memorandum of Law In Support - Proceed to Trial [etc.]," Docket No. 111, p. 3), but he has not attributed that lapse to any other specific cause.

---

[6] CCA offers no hint as to what type of "legitimate penological interest" might justify a one-week interruption of an inmate's prescription medications.

The two drugs that appear to be most important to Plaintiff, Tylenol-3 and Soma, are not on the list, or "formulary," of medications that are normally available to PCF inmates. To prescribe non-formulary drugs such as Tylenol-3 and Soma, PCF doctors must make a specific and well-explained written request to CCA's corporate medical director. (Schotzko Aff., ¶s 4-6.) According to Dr. Schotzko, "prescriptions for Tylenol #3, Valium and Soma were routinely rejected by the prison," (presumably meaning CCA). (Id., ¶ 6.) Thus, it is quite conceivable that Plaintiff's prescriptions for Tylenol-3 and Soma were interrupted in September 2001 because CCA's medical director did not issue a timely approval for the continuation of those non-formulary drugs. However, the record does not include enough evidence to fully substantiate this hypothesis.[7]

**III. DISCUSSION**

The requirements for sustaining an Eighth Amendment claim based on deliberate indifference to a prisoner's serious medical needs were discussed in R&R-I.[8] The Court noted that a prisoner-plaintiff must prove three elements to prevail on such a claim. First, the prisoner must show the existence of some specific, objectively serious, medical need,

---

[7] Some of the exhibits attached to Dr. Schotzko's affidavits seem to show, quite clearly, that during the summer of 2001 he (Dr. Schotzko) tried to make sure that Plaintiff would continue to receive Tylenol-3, Soma and Xanax. ("Non-formulary Request Forms," dated July 17, 2001, attached to Schotzko Aff.) However, CCA's medical director, Dr. Seda, vetoed those requests, (id.), even though, as far as the Court can tell, she never treated Plaintiff as a patient, and probably never even met him. Dr. Seda has not filed an affidavit in this case, so it impossible to know why she felt qualified to override the recommendations of Plaintiff's treating physician, Dr.Schotzko.

[8] The standard of review for summary judgment motions also was discussed in R&R-I, and will not be repeated here. The Court has been mindful of the general principles governing summary judgment, as discussed in R&R-I, while evaluating the presently pending motions.

i.e., one that is both readily discernible, and involves a significant risk to his health. Second, he must show that the defendant was personally aware of his particular medical need and its seriousness. Third, he must show that the defendant, while aware of his serious medical needs, was deliberately indifferent to those needs. See R&R-I, at pp. 14-15, citing Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997), and Mays v. Rhodes, 255 F.3d 644, 649 (8th Cir. 2001) ("[d]eliberate indifference requires proof that [the prisoner-plaintiff] suffered objectively serious medical needs and that the [defendants] actually knew of these needs but deliberately disregarded them").[9]

In R&R-I, the Court concluded that Plaintiff probably can prove the first element of his Eighth Amendment claim -- i.e., that he had a serious medical need. Neither of the Defendants has presented any new evidence that would cause the Court to reconsider that conclusion. The record clearly shows that Plaintiff has a history of back pain, and that he has needed regular medical treatment to cope with his chronic pain. The record also shows that Plaintiff has developed a heavy reliance on narcotic strength pain relievers, and that he is vulnerable to significant withdrawal symptoms if he is deprived of those medications. Although both Defendants have argued that Plaintiff suffered no more than "de minimus injury" as a result of their medical care, neither Defendant has made any serious effort to show that Plaintiff's chronic back pain and addiction to pain killers should not be considered "serious medical needs" for Eighth Amendment purposes.

---

[9] The substantive requirements for an Eighth Amendment deliberate indifference claim were also reviewed in the District Court Judge's order adopting R&R-I. (Order dated September 30, 2001, [Docket No. 76], pp. 5-6.)

Nor does either Defendant claim to have been unaware of Plaintiff's serious medical needs. Indeed, the record clearly shows that both Dr. Schotzko and CCA were well aware of Plaintiff's underlying back pain, and that his pain became more severe when he did not receive adequate pain relief treatment. The record also shows that both Defendants considered Plaintiff to be addicted to some of the medications he had been taking for a long time, (most notably, of course, Tylenol with codeine). It can be can be readily inferred that both Defendants knew Plaintiff would suffer painful withdrawal symptoms if he were suddenly deprived of those addictive medications for any extended period of time.

Thus, based on the present record, the Court finds (once again) that a reasonable trier of fact could find in Plaintiff's favor on the first two elements of his Eighth Amendment claim. The only remaining issue to be resolved then is whether a reasonable fact finder could conclude that either or both of the Defendants acted with deliberate indifference toward Plaintiff's serious, and well-recognized, medical needs. With that issue in mind, Plaintiff's claims against the two named Defendants will be separately considered.

A. Plaintiff's Claims Against Dr. Schotzko

Dr. Schotzko was previously denied summary judgment in this case because he did not submit any evidence showing that he offered any medical treatment for Plaintiff's serious medical needs. The earlier record showed that Dr. Schotzko curtailed Plaintiff's prescriptions for Tylenol-3 and Valium in late July and early August of 2000, and that he knew (or should have known) that Plaintiff would suffer serious back pain and withdrawal symptoms as a result of his actions. It also appeared, from the limited evidence in the record at that time, that Dr. Schotzko did nothing to try to help Plaintiff cope with those problems. It now appears, however, that Dr. Schotzko did offer some medical assistance

to Plaintiff in late July and early August of 2000.

The Court initially finds that Dr. Schotzko did not act with deliberate indifference toward Plaintiff's serious medical needs just by altering his prescriptions for Tylenol-3 and Valium in late July 2000. Dr. Schotzko's current affidavit shows that he changed Plaintiff's prescriptions based on a good faith belief that Plaintiff would suffer long-term health problems if he remained addicted to Tylenol-3 and Valium.

The current record further shows that after Plaintiff's prescriptions were changed, Dr. Schotzko was not deliberately indifferent to Plaintiff's requests for medical assistance. It is now evident that Dr. Schotzko was unaware of Plaintiff's requests for assistance during the first few days after the revised prescriptions went into effect, i.e., July 28-30. Dr. Schotzko did not work at the prison on any of those days, and there is no evidence suggesting that he was aware of Plaintiff's duress during those days. Therefore, it cannot be said that Dr. Schotzko knew about, and deliberately disregarded, Plaintiff's medical needs during that three-day period.

With the benefit of hindsight, it looks like Dr. Schotzko may have exercised poor judgment when he decided to change Plaintiff's prescriptions on the eve of a three-day weekend. It may have been far more prudent for Dr. Schotzko to have changed the prescriptions at a time when he would have been present to personally monitor Plaintiff's reaction to the changes. However, there is no evidence suggesting that Dr. Schotzko deliberately timed the prescription changes to coincide with his three-day weekend. And poor judgment alone will not support an Eighth Amendment cause of action. Estelle v. Gamble, 429 U.S. 97, 106 (1976) ("a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical

mistreatment under the Eighth Amendment"). Furthermore, Dr. Schotzko did not leave Plaintiff without any pain medications at all; Plaintiff was still able to get some Tylenol-3, as well as Darvocet. Those prescriptions may not have been sufficient to treat Plaintiff's pain, but they preclude a finding of deliberate indifference during the period of July 28-30.

When Dr. Schotzko returned to the prison on Monday, July 31, 2000, he met with Plaintiff and talked to him about the prescription changes. Dr. Schotzko responded to Plaintiff's complaints by offering him Baclofen, Darvocet and Ibuprofen. (Schotzko Aff., ¶ 21.) He later offered Imipramine and Xanax. (Id., ¶ 22.) Dr. Schotzko also allowed Plaintiff to receive more Tylenol-3 in August 2000, and he continued to offer Plaintiff alternative medications.

Of course, Plaintiff has argued, (both then and now), that none of Dr. Schotzko's suggested alternatives was an acceptable substitute for his long-standing prescriptions for Tylenol-3 and Valium. Plaintiff has consistently claimed (perhaps with some justification) that the substitute medications recommended by Dr. Schotzko were not at all appropriate, either because they did not work, or because they had bad side effects. If this were a medical malpractice case, the dispute over Dr. Schotzko's drug recommendations might be viewed as genuine issue of material fact that would necessitate a trial. In an Eighth Amendment case, however, a prisoner cannot survive a summary judgment motion just by showing that he disagrees with his doctor's treatment -- even if the prisoner is provably right, and the doctor is provably wrong. Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) ("'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation'"), quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir.

1995); see also Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir. 1990) (prisoner's Eighth Amendment claims – including a claim that he did not receive sufficient pain-killers -- was properly dismissed on summary judgment, because his claims were based on "nothing more than mere disagreement with the course of his medical treatment"). Thus, the ultimate propriety of Dr. Schotzko's drug recommendations is not a genuine issue of material fact in this case. See Estelle v. Gamble, 429 U.S. at 106 ("[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner").

As our Court of Appeals explained in Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996):

> "[N]othing in the Eighth Amendment prevents prison doctors from exercising their independent medical judgment. White v. Farrier, 849 F.2d 322, 327 (8th Cir. 1988). Prisoners do not have a constitutional right to any particular type of treatment. See id. at 327-28. Prison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment." Kayser v. Caspari, 16 F.3d 280, 281 (8th Cir. 1994); Taylor v. Turner, 884 F.2d 1088, 1090 (8th Cir. 1989)."

Applying these principles here, the Court now finds that Plaintiff's Eighth Amendment claims against Dr. Schotzko cannot survive summary judgment. Dr. Schotzko was exercising his "independent medical judgment" when he tried to wean Plaintiff from Tylenol-3 and Valium in late July and early August of 2000. The record now shows that Dr. Schotzko did not deliberately ignore Plaintiff's pleas for medical assistance. He did not hear some of those pleas because he was away from the prison for three days, and he did respond to the pleas that he did hear by offering Plaintiff several alternative medicines.

Plaintiff may disagree with Dr. Schotzko's treatment of his back pain and addiction, and he may even have good reasons for such disagreement, but that is not enough to sustain an Eighth Amendment claim. Dr. Schotzko obviously did not provide the type of

medical care that Plaintiff wanted, and perhaps he did not even provide reasonably competent medical care; but Dr. Schotzko did not deliberately ignore Plaintiff's need for medical care altogether. While the Court is sympathetic to Plaintiff's plight, the Court finds this to be a case involving a disagreement over proper medical treatment – not a case involving deliberate indifference.

The Court also specifically notes that there is no evidence suggesting that Dr. Schotzko was responsible for the changes to Plaintiff's medication regimen that occurred in September 2001. As previously mentioned, Plaintiff has not even alleged that Dr. Schotzko caused the interruption of his drug supply during the September 7-14 period. If anything, the record seems to indicate that around that time Dr. Schotzko was actually trying to keep Plaintiff's prescriptions for Tylenol-3 and Soma from lapsing, despite opposition from CCA's medical director. (See n. 7, supra.) In any event, Plaintiff has cited no facts that would allow a jury to find that Dr. Schotzko was deliberately indifferent to his medical needs during September 2001.

B. Plaintiff's Claims Against CCA

Plaintiff also claims that CCA deliberately disregarded his serious medical needs. The Court finds this claim to be unsustainable as well.

A private corporation such as CCA cannot be held vicariously liable for Eighth Amendment violations committed by its individual employees, "because respondeat superior is not a basis for liability under 42 U.S.C. § 1983." Smith, 910 F.2d at 502. Private corporations, like municipal corporations, can be liable under § 1983 only for constitutional violations caused by some corporate policy or custom. Sanders v. Sears, Roebuck & Co., 984 F.2d 972, 975-76 (8th Cir. 1993) ("a corporation acting under color of state law will only

be held liable under § 1983 for its own unconstitutional policies"). See also Buckner v. Toro, 116 F.3d 450, 453 (11th Cir.) ("policy or custom requirement applies in suits against private entities performing functions traditionally within the exclusive prerogative of the state, such as the provision of medical care to inmates"), cert. denied, 522 U.S. 1018 (1997).

In this case, Plaintiff has not identified any CCA corporate policy or custom that caused a violation of his Eighth Amendment rights. CCA certainly cannot be liable for any claims based on events that occurred during July and August of 2000, because there is no evidence that CCA played any role in those events. It is true that Dr. Schotzko has stated, in general terms, that requests for non-formulary drugs such as Tylenol-3, Valium and Soma "were routinely rejected by the prison." (Schotzko Aff., ¶ 6.) However, his affidavit clearly shows that he determined that Plaintiff was addicted to Tylenol-3 and Valium, and that it was his decision to try to wean Plaintiff from those drugs. (Id., ¶ 9.) Furthermore, Dr. Schotzko's affidavit indicates that CCA did not play an active role in the PCF drug prescription process until April 2001, (id., ¶s 4-5), which was well after the medication problems of July and August 2000 had been resolved. Thus, the only inference that can be drawn from the present record is that Dr. Schotzko -- not CCA -- was responsible for the modifications to Plaintiff's drug regimen that occurred during the summer of 2000.

Plaintiff also is unable to connect any CCA policy or custom to the medication lapse that occurred in September 2001. He contends that CCA has a custom or policy of "cost-saving" and "cutting corners for profit," ("Plaintiff's Reply & Memorandum of Law [etc.]," [Docket No. 111], p. 5), but even if that is so, there are no facts suggesting that any such custom or policy caused his medications to lapse in September 2001.

The fact that Plaintiff's medications suddenly stopped, apparently without any doctor's order, and then were restarted a week later -- again, apparently without a doctor's order -- tends to support CCA's contention that the lapse was "inadvertent." In any event, Plaintiff certainly has not offered any evidence to show that the week-long interruption of his normal medication regimen was caused by a CCA corporate custom or policy. Plaintiff is therefore unable to sustain his Eighth Amendment claim against CCA.

## IV. CONCLUSION

For the reasons discussed above, the Court will recommend that Defendants' motions for summary judgment be granted, that Plaintiff's motion for summary judgment, (Docket No. 124), be denied, and that this action be dismissed. It should be noted, however, that the Court has found this case to be a difficult and troubling one. Although the Court has found that Defendants did not act with deliberate indifference, they certainly cannot be proud of the way they have treated Plaintiff. Describing Plaintiff's pain as "de minimus," as both Defendants have repeatedly done, shows a disturbing lack of concern for his medical condition.

The Court also notes that this case probably will not be fully completed any time soon. Plaintiff will undoubtedly object to this Report and Recommendation, and if it is upheld by the District Judge, he probably will appeal to the Eighth Circuit. Of course, there is always the possibility of new lawsuits, as well -- especially if CCA continues to interfere with the recommendations of Plaintiff's treating physicians. Plaintiff has been battling with PCF officials about his medications for more than two years now, and there appears to be no end in sight.

With these matters in mind, the Court encourages the parties to resolve their disputes "out of court" before they consume any more judicial resources. Perhaps it would be best for everyone if Plaintiff were transferred back to Wisconsin, in exchange for a waiver of all claims arising in connection with his medical care at PCF. All parties are urged to seriously consider this possibility.[10]

## V. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Defendant Corrections Corporation of America's motion for summary judgment, (Docket No. 106), be **GRANTED**;

2. Defendant John M. Schotzko's motion for summary judgment, (Docket No. 118), be **GRANTED**;

3. Plaintiff's motion for summary judgment, (Docket No. 124), be **DENIED**; and

4. This action be dismissed with prejudice.

Dated: August 12, 2002

JONATHAN LEBEDOFF
Chief Magistrate Judge

Under D.Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by AUGUST 30, 2002, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo

[10] The Court recognizes that the parties may have already attempted such a settlement, but they are encouraged to renew and redouble their efforts -- starting, perhaps, by sharing the Court's observations with prison officials in Wisconsin.